FRANK AND MARIANNE OWEN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Owen v. Commissioner
Docket Nos. 41476-86; 13374-87; 18050-87; 18052-87; 32313-87; 37014-87; 39079-87
United States Tax Court
T.C. Memo 1990-172; 1990 Tax Ct. Memo LEXIS 198; 59 T.C.M. (CCH) 290; T.C.M. (RIA) 90172; March 29, 1990
Towner Leeper and John Leeper, for the petitioners. Phillip A. Pillar and Lewis J. Hubbard, Jr., for the respondent. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: The primary issues for decision are: (1) Whether certain petitioners may amend their petitions to conform to the proof. We hold they may. (2) Whether the joint stipulation that a document is true and correct establishes as a fact the truth of the contents of the document. We hold it does not. (3) Whether petitioners may deduct their distributive shares of prepaid intangible drilling and development costs (hereinafter "IDCs") in the year of payment under section 263(c). [2] We hold they may not. *201 (4) Whether petitioners are at risk beyond their cash contributions. We hold they are not at risk beyond their cash contributions. (5) Whether certain legal, management, and finance fees are deductible. We hold the fees are not deductible, but may be amortized under section 709. (6) Whether reliance on accountants and prospectuses shields petitioners from additions to tax for negligence under section 6653(a). We hold it does not. (7) Whether additions to interest under section 6621(c) are applicable. We hold they are. Respondent determined deficiencies in Federal individual income tax against petitioners as follows: Name/
Docket No.
Year
Entity
Deficiency
Additions
Owen
41476-86
1982
None
$  3,895.00
-
Holland
13374-87
1980
Willow
44,506.00
-
Hermann
18050-87
1981
Carnegie
1,667.00
$ 83.35 * plus amounts to
to be determined under
sections 6653(a)(2) and
6621(c)
Crocker
18052-87 [3]
1981
Carnegie
2,321.00
$ 116.05 * plus amounts
to be determined under
sections 6653(a)(2) and
6621(c)
Thomas
32313-87
1981
Carnegie
9,814.00
$ 490.70 * plus amounts
to be determined under
sections 6653(a)(2) and
6621(c) Henderson
37014-87
1980
Willow
9,159.00
An amount to be
determined under
section 6621(c)
1981
Carnegie
13,058.00
$ 652.90 * plus amounts
to be determined under
sections 6653(a)(2) and
6621(c)
Owen
39079-87
1981
Carnegie
91,737.35
$ 4,586.87 * plus amounts
to be determined under
sections 6653(a)(2) and
6621(c)
*202 These cases were consolidated for decision and submitted fully stipulated under Rule 122. The relevant facts are so found and are summarized below. FINDINGS OF FACT Petitioners are individuals who resided in El Paso, Texas, when these petitions were filed. These cases generally involve parties who set up two oil and gas partnerships, [4]Willow Drilling, Ltd. (Willow) and Carnegie Drilling, Ltd. (Carnegie), near the end of each taxable year in which they deducted prepaid IDCs. Petitioners invested in one or both of the partnerships as limited partners. On their income tax returns, petitioners deducted their distributive shares of IDCs and certain losses. Respondent disallowed these deductions. *203 We will examine each partnership separately, beginning with Willow. 1. Willow Drilling, Ltd.
Willow was established by a limited partnership agreement dated December 2, 1980. Its stated purpose was primarily to engage in development drilling for natural gas in Greer County, Oklahoma. a. The Principals
Charles A. Moeri, III (Moeri) was Willow's general partner. His business experience began with International Paper Company. In 1970, he joined John Hancock Insurance Company in El Paso, Texas. Four years later he entered into an insurance and investment partnership where he did research and marketing. In 1978, he founded Diversified Financial Planning, which researched and marketed oil and gas investments, tax-exempt securities, investment-grade diamonds, and other tax-oriented investments. Moeri is registered with the National Association of Securities Dealers, is a Certified Diamond Counselor, and is a member of the International Association of Financial Planners. Before 1980, he had no experience as a general partner. He served as general partner in another 1980 drilling program called Fentress County Investors, Ltd. (Fentress). Moeri's driller in both the *204 Willow and Fentress programs was Quadrant Exploration, Inc. (Quadrant). Quadrant's principal was Thomas D. Hogan (Hogan). Hogan owned 80 percent of Oil Funds Management, Inc., which, in 1980, wholly owned Quadrant. Hogan also owned Oil Funds Investment, Inc., and TDH Consulting Corporation in 1980. The letters, TDH, are the initials of Thomas D. Hogan. Oil Funds Management, Inc., and its subsidiaries were acquired by Penn Pacific Corp. (Penn Pacific) in 1980. Penn Pacific owned the oil and gas lease that Willow was to acquire and exploit. The law firm of Kass & Fried, P.A. represented both Willow and Moeri. They prepared documents and rendered tax advice in connection with the Willow offering. They also represented Hogan's company, Quadrant. Mortimer Kass (Kass), an attorney with the firm Kass and Fried, P.A., was one of the Willow partners. b. Offering Memorandum
A Willow prospectus and offering memorandum dated December 5, 1980, was prepared by Hogan's Oil Funds Investment, Inc. and Kass and Fried, P.A. and distributed to prospective investors. According to the offering, Willow was to raise $ 720,000 by selling 36 units at $ 20,000 each. An additional $ 500 per *205 unit would be allocated for legal and organizational expenses. To purchase a unit, an investor was required to pay $ 10,000 in cash and $ 10,000 in the form of a promissory note due December 31, 1985. Willow could either negotiate the notes with an unaffiliated lender, or pay a portion of the turnkey drilling contract with the notes. The offering further stated that Willow did not have drilling sites, but that it was to acquire a drilling site or sites from Penn Pacific. Willow actually acquired drilling sites from Penn Pacific in August 1981. c. Partner Contributions
Petitioners made the following contributions to Willow in December 1980: Cash
Notes
Holland
$ 42,000
$ 40,000
Henderson
$ 10,500
$ 10,000
Of the cash portion of petitioners' investments, $ 2,000 paid by Holland and $ 500 of the cash paid by Henderson represent legal expenses. The notes include the following provision: This Note is being delivered to the Partnership as partial payment for the Maker's purchase of a limited partnership interest in the Partnership. In consideration of the Partnership's agreement to accept payment by delivery of this Note in lieu of cash, the *206 Maker hereby agrees that the Partnership shall have the unrestricted right to set off and apply, as a required prepayment hereunder, 75% of all amounts otherwise distributable to the Maker in his capacity as a limited partner of the Partnership. All prepayments shall be applied first to accrued but unpaid interest and then to principal. * * * Partners Moeri, Hogan, and Kass contributed no cash to Willow. Instead, they contributed promissory notes similar to those contributed by petitioners, in the original principal sums of $ 20,000, $ 10,000, and $ 10,000, respectively. These notes were given by Moeri, Hogan and Kass to meet the stated contract price for three wells. On December 29, 1980, Willow assigned all limited partner notes, totalling $ 110,000, to K and S Associates, Inc. (K and S). K and S was partly owned by attorney Kass. Petitioners never made any payment of principal or interest on the notes held by K and S. K and S never made demand on the Willow limited partner notes that it held on behalf of Quadrant or its assignees. Willow filed an Amended Certificate of Partnership dated December 29, 1980, with the Secretary of State of Texas to reflect capital contributions *207 of its partners. d. Turnkey Drilling Contract
Moeri, for Willow, and Hogan, for Quadrant, executed a Willow turnkey drilling contract dated December 29, 1980. The specific terms of the turnkey drilling contract were determined by Hogan or Kass. Under the Willow turnkey contract, three wells were to be drilled. "Commercially productive" wells were required. The contract defines a commercially productive well as one that will generate net income sufficient to return its turnkey price of $ 94,000 (turnkey price per well) within three years. The turnkey contract also provided: In the event an initial well drilled pursuant to Paragraph 1 is not deemed to be commercially productive, the Driller shall be required to replace such well. In making such replacement: (1) the driller in its sole discretion may acquire on behalf of the Owner either drill sites, fractional working interests on other leasehold interests in prospective oil and gas properties anywhere in the continental United States; * * * The contract also required the driller to obtain drilling risk insurance. The turnkey fee was $ 94,000 per initial well, including $ 79,000 to be paid at the execution of *208 the contract. The driller was to begin drilling within 90 days, or be liable to Willow for $ 100 per day in liquidated damages. The turnkey contract also included a recital that Willow subleased three drilling sites. Under the turnkey contract Willow executed a nonrecourse promissory note in the amount of $ 45,000 ($ 15,000 each for 3 wells) to Hogan's company, TDH Consulting Corporation, on December 29, 1980, for tangible equipment and completion costs. e. The Money Trail
On December 31, 1980, Willow deposited $ 115,701.63 in its checking account at Valley Bank, El Paso, Texas. Of this amount, $ 115,000 represents cash contributions of the limited partners. Willow made several disbursements by checks dated December 31, 1980. Willow paid $ 90,636.37 to Hogan's company, Quadrant. That amount was deducted as IDCs. Willow paid $ 14,600 and $ 1,000 to Moeri as general partner. Willow paid $ 1,090.83 to Hogan's Oilfunds Investment, Inc., [5] as the cost of preparing the offering memorandum. Willow paid $ 1,000.11 to Kass' K & S Associates as interest on the notes. Willow paid $ 5,500 to Kass & Fried as legal fees. Willow paid $ 517 to T-Bird Travel, Inc., for Moeri's *209 travel. Moeri's father-in-law, who withdrew as a limited partner after Willow's formation, received $ 100. A check for $ 1,200 was paid to the Texas Secretary of State for filing fees. Willow also executed a nonrecourse note to TDH Consulting Corporation in the original principal sum of $ 45,000 for tangible equipment and drilling costs. Of the $ 90,636 paid to Hogan's company, Quadrant, Quadrant apparently paid $ 6,200 to Hogan's TDH Consulting Corporation, but Hogan does not recall why. Willow transferred to Quadrant the $ 110,000 Willow received from K and S in exchange for the assignment of the limited partner notes and $ 90,636. Hogan does not know how Quadrant spent either the $ 110,000 or the $ 90,636 claimed as IDCs. Kass does not know how either the $ 110,000 or $ 90,636 claimed as IDCs was spent. There is no evidence in the record accounting for these sums. f. Income Tax Returns
In its Federal partnership tax return for taxable year 1980, Willow deducted $ 240,636 *210 in IDCs as follows: ITEM
AMOUNT
Limited Partners' Notes
$ 110,000
Check to Quadrant
90,636
Willow Note to Quadrant
40,000
Total
$ 240,636
Each petitioner's individual Federal income tax return was prepared by the certified public accounting firm of Peat, Marwick, Mitchell & Company. Petitioners relied on the prospectus in determining tax treatment. Petitioners Holland claimed $ 75,963 in deductions from Willow for taxable year 1980. Respondent allowed $ 2,662 in deductions for 1980 representing petitioners' share of deductible organizational expenses. Petitioners Henderson claimed $ 18,990 in deductions for 1980 from Willow. Respondent allowed $ 666 in deductions as the Hendersons' share of deductible organizational expenses. Respondent allowed Willow $ 80,212 for tangible drilling and development costs for taxable year 1981. g. The Business
Willow's only activities in 1980 were to enter into contracts and to issue checks. It did not do any drilling or preparatory work in 1980. In January or February 1981, Quadrant subcontracted its Willow contract to Penn Pacific. Willow and Quadrant had intended at the time *211 the turnkey contract was executed that it would be assigned to Penn Pacific by Quadrant. Quadrant was acquired by and became a wholly-owned subsidiary of Penn Pacific in December 1980 or sometime in 1981. In March 1981, Penn Pacific began drilling a well known as "Kopecek No. 1-5." Although Hogan advised Moeri in late April 1981 that the Kopecek No. 1-5 well was prepared to be completed and tied into the line, the Kopecek well continued to experience difficulties. On June 5, 1981, while having problems with the Kopecek well, Penn Pacific offered to furnish "sufficient production from wells in the Willow field" to Willow to complete the drilling program in lieu of drilling wells. This offer was rescinded two weeks later. On June 22, 1981, Moeri wrote to Penn Pacific demanding that Penn Pacific either "furnish sufficient production to replace KOPECEK #1-5" or "complete original well as contracted." By April 1982, the Kopecek No. 1-5 well was still not in production. Oilfunds Management, Inc., and its subsidiaries went into Chapter 11 bankruptcy sometime in 1981. Effective April 1, 1982, Penn Pacific purportedly assigned its rights in the operating agreement of the Kopecek 1-5 leasehold *212 in Greer County, Oklahoma, to American Energy Corporation (AEC). Moeri was notified of this assignment in a letter from AEC dated September 28, 1982. The Kopecek No. 1-5 well was plugged by the State of Oklahoma on September 5, 1984. It was the only one of the three wells specified in the Willow prospectus which was drilled. The limited partners did not make any payment of interest or principal on their notes contributed to Willow. None of the petitioners received any demand or request for payment on any of their notes. No serious effort was made to collect on any of the notes made by Willow or by the partners. 2. Carnegie Drilling Ltd.
The Carnegie partnership was operated and financed in much the same manner as Willow. Carnegie was syndicated by means of a limited partnership offering in late 1981. Its stated purpose was primarily to engage in development drilling for oil in Caddo County, Oklahoma. a. The Principals
In addition to serving as general partner for the 1980 Willow and Fentress programs, Moeri was the general partner for the 1981 programs for Carnegie and for Caddo-Drilling, Ltd. Carnegie's driller was to be Command Petroleum Corporation (Command). *213 Oilfunds Investments, Inc., owned by Hogan, owned Command preferred stock. Hogan described himself as the chairman of Command, although he signed correspondence for Command in other capacities, such as president. Hogan also owned Security Oil and Gas, Inc., another entity that later became a Carnegie driller. The law firm of Kass & Fried, P.A., represented Carnegie. Although petitioner Crocker knew Moeri previously, none of the petitioners investing in Carnegie had ever done business with Moeri or any of the companies with which Carnegie did business. b. Offering Memorandum
The Carnegie offering memorandum given to petitioners, dated October 26, 1981, was substantially identical to the Willow memorandum. According to the prospectus, the partnership would offer up to 48 units at $ 20,000 per unit. Each unit required payment of $ 8,000 in cash and $ 12,000 in a series of notes payable in the principal sum of $ 4,000 on August 1, 1982, and $ 8,000 on December 31, 1986, subject to the terms stated therein. The offering also provided that Carnegie would pay $ 1,200 per unit for an "Initial Management Fee." Moeri was paid $ 75,600 for marketing the Carnegie offering. *214 At the time of the offering, Carnegie did not have a drilling site. According to the offering, the drilling site would be acquired from or through Hogan's company, Oilfunds Investment, Inc. It is not clear if and when Carnegie obtained rights to a drilling site. c. Partner Contributions
Petitioners characterized amounts contributed to Carnegie in December 1981, when the partnership was formed, as follows: Legal Fees and
Petitioner(s)
Cash Payment
Organization Costs
Notes
Crocker
$ 4,275
$ 275
$   6,000
Owen
111,150
7,150
156,000
Herman
2,137
137
3,000
Henderson
17,000
1,000
24,000
Thomas
8,550
550
12,000
The series of notes executed by petitioners were essentially identical. d. Turnkey Drilling Contract
Moeri, for Carnegie, and Hogan, for Command, executed the turnkey drilling contract on December 30, 1981. The contract required Command to drill 21 wells in the Pontotoc formation to depths stated. It also required "commercially productive" wells to be produced by Command. The contract defines a commercially productive well as one that will generate net income sufficient to return *215 its turnkey price of $ 62,500 (based on 21 wells) within 3 years. The turnkey contract also provided: In the event an initial well drilled pursuant to Paragraph 1 is not commercially productive, the Driller shall be required to replace such well. In making such replacement: (1) the Driller, with the consent of the General Partner, may acquire on behalf of the Owner either drill sites, fractional working interests on other leasehold interests in prospective oil and gas properties anywhere in the continental United States; (2) replacement property shall be no less than the Driller's actual cost of drilling, testing and completing an initial well, as contemplated herein; and (3) the percentage of production revenues payable to Owner and reasonable anticipated gross revenues to Owner from such replacement well shall not be less than those associated with, or anticipated from the initial well. * * * The contract also required the driller to obtain drilling risk insurance. The turnkey contract stated that Carnegie owned, as sublessee, drilling sites in Caddo County, Oklahoma. The contract called for Carnegie to pay Command $ 62,500 per well, of which $ 52,000 represented IDCs. *216 The required 21 commercially productive wells were never drilled by Command or any assignee. Four wells were drilled. Carnegie did not have any drill site acreage in 1981. Carnegie did not acquire any drill site acreage in Caddo County, Oklahoma, during 1981 or 1982. On April 6, 1983, Security Oil & Gas, Inc., assigned two wells in Pontotoc County, Oklahoma, to Carnegie. It is not clear whether the wells were drilled by others and purchased by Security for Carnegie, or whether they were drilled specifically for Carnegie. e. The Money Trail
As partial payment for the IDCs, Carnegie executed two promissory notes dated December 30, 1981, in the principal sums of $ 252,000 and $ 504,000. The notes state that no limited partner is personally liable for principal or interest except to the extent of the assumption of personal liability pursuant to the limited partnership agreement and to the extent of personal liability on promissory notes pledged as collateral. The partnership agreement provides that limited partners are directly liable for notes of the limited partners to the partnership for their capital contribution or to any assignee up to the amount of their capital *217 contribution with no further liability, but not until receipt by the partnership of the proceeds of the limited partners' notes. In a document titled "Assignment Separate From Notes," Carnegie assigned to Command the $ 756,000 in limited partner notes. As of the date these cases were submitted, no payment of interest or principal had been made on any limited partner note given to Carnegie and assigned thereafter by Carnegie. Carnegie has not made any payment of principal or interest on its notes to Command as of the date these cases were submitted. K and S held the Carnegie limited partner notes as of the date these cases were submitted and had not initiated suit to collect on these notes. f. Income Tax Returns
On its 1981 income tax return, Carnegie deducted $ 1,102,500 in IDCs. This included promissory notes totalling $ 756,000, discounted to $ 735,000, and cash of $ 367,500. The cash was all of the cash contributions from limited partners. Carnegie also deducted $ 30,240 as management fees, and $ 11,150 as legal fees. Carnegie further deducted financing fees of $ 31,500, including $ 21,000 for the discount of the notes referred to above and $ 10,500. Each petitioner's *218 individual Federal income tax return was prepared by the certified public accounting firm of Peat, Marwick, Mitchell & Company. Petitioners relied on the prospectus in determining tax treatment. All petitioners took their pro rata share of deductions claimed above. Respondent denied all deductions except for $ 323 for amortization costs. g. The Business
As required by the turnkey contract, Carnegie obtained drilling risk insurance on December 28, 1981. Carnegie did not have an active trade or business in 1981. It did not perform any drilling or preparatory work in 1981. By letter dated January 5, 1982, Oilfunds Investments, Inc., sent, among other things, a "copy of the * * * assignments of leases from Command Petroleum Corp. to * * * Carnegie Drilling Ltd., which [has] not yet been filed" with an enclosure representing a purported assignment of an oil and gas lease from Command to Carnegie dated January 8, 1982. By letter dated May 11, 1982, Hogan, for Command, wrote Moeri to provide a "Status Report" on Carnegie, which included a description of "three alternatives" involving leases in Texas and Oklahoma. In an apparent letter agreement dated September 15, 1982, Carnegie *219 and Command admitted that the wells to be drilled according to the turnkey contract had been "delayed" and Command offered to substitute certain wells for the wells to be drilled under the turnkey contract. By letter dated September 15, 1982, Command wrote to Moeri. Command claimed that "a new and proven replacement lease" had been agreed to be provided to Carnegie and asked Carnegie to make a payment on the note due August 1, 1982. By letter dated October 22, 1982, Carnegie agreed with Hogan's company, Security Oil and Gas (Security), that Security would assume the turnkey contract and that Security would drill certain wells based on the condition that the notes would be brought current. On October 29, 1982, Moeri wrote to Command, stating that he had "not received leases or any other information relating to the drilling" or "any reports" concerning the wells to have been drilled by Command. By letter dated November 11, 1982, and signed by Fred G. Luke, Field Management Company apparently agreed to assume, among other things, the Carnegie/Command drilling contract. By letter from Security to Moeri, dated April 21, 1983, Security represented that "two wells * * * assigned *220 to your limited partnership" were in production and that assignments and division orders would be forthcoming. Security enclosed an apparent assignment of two wells known as Lucy Harjo Nos. 101 and 115 from Security to Carnegie, dated April 6, 1983. In a letter from Security to Moeri, dated March 4, 1983, Security reported that four of the wells were in production with assignments to be made. Oil Field Management, Inc., did the actual drilling in 1983. According to a letter dated May 24, 1984, Security further assigned the Carnegie turnkey drilling contract to Reliance Petroleum Corporation (Reliance). Reliance claimed to hold the Carnegie contract as of the date of the letter. The letter also represents that Reliance understands its obligation to Carnegie to "assign three wells to Carnegie Drilling." By letter dated August 22, 1984, Reliance wrote to Moeri and enclosed documents evidencing the admission of Carnegie as a limited partner "in the Kansas Offset Program." In a letter dated August 14, 1985, to an investor, Moeri stated that Reliance assigned an interest in a partnership called "Kansas Offset Drilling Ltd." to Carnegie "to fulfill their initial drilling obligation. *221 " Security was wholly owned by Hogan during the years at issue. Hogan does not know how any of the $ 367,500 was spent by Command. None of the petitioners received any demand or request for payment with respect to any of the notes. OPINION I. Petitioners' Motion to Amend to Conform to Proof
We first address the Motions to Amend Petitioners [sic] to Conform to Evidence filed on behalf of petitioners Owen in docket No. 41476-86 and Henderson in docket No. 37014-87. The motions were filed when these cases were submitted. Petitioners Owen filed two petitions as a result of two notices of deficiency: (1) docket No. 41476-86, which alleges that respondent erred in disallowing a charitable contributions carryover for taxable year 1982 (neither Willow nor Carnegie was mentioned in the notice of deficiency for 1982); and (2) docket No. 39079-87, which alleges that respondent erred in determining a deficiency for taxable year 1981 by disallowing deductions associated with Carnegie. Petitioners Henderson filed one petition, docket No. 37014-87, which alleges that respondent erred in determining a deficiency for taxable year 1980 by disallowing deductions associated with *222 Willow, and for taxable year 1981 by disallowing deductions associated with Carnegie. In the motions, petitioners Owen and Henderson seek to amend their petitions to claim that deductions which were originally claimed for Willow in 1980 and for Carnegie in 1981 should be allowed instead for Willow in 1981 and for Carnegie in 1982. In support of the motions, petitioners argue that they should be allowed to amend their petitions to conform to the evidence and to the position argued by respondent. This is based on respondent's position that Willow was not an operator in 1980 because it did not own a mineral interest until 1981, if at all; and Carnegie was not an operator in 1981, but may have become an operator in 1982 or later. Respondent claims surprise and prejudice if the motion to amend the pleadings is granted in that no attempt was made to disprove operator status for Willow in 1981 and for Carnegie in 1982 because those matters were not at issue. Rule 41(a) provides that parties may amend their pleadings only by leave of Court or by written consent of the adverse party; and that *223 leave shall be given freely when justice so requires. Rule 41(a) also provides that no amendment which confers jurisdiction not otherwise conferred by the petition then on file shall be permitted. However, respondent concedes on brief that the Owens' petition in docket No. 41476-86 places taxable year 1982 before the Court. The Hendersons' petition, docket No. 37014-87, is from a notice of deficiency concerning adjustments for Willow in 1980 and Carnegie in 1981; thus both taxable years 1980 and 1981 are before the Court. Rule 41(b) provides in part: (b) Amendments To Conform to the Evidence: (1) Issues Tried by Consent: When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. The Court, upon motion of any party at any time, may allow such amendment of the pleadings as necessary to cause them to conform to the evidence and to raise these issues, but failure to amend does not affect the result of trial of these issues. Because the facts necessary to resolution *224 of the issue were fully stipulated under Rule 122, we do not believe that respondent is prejudiced if the motion is granted. We will allow the pleadings to be amended so the Court may reach the issues to which stipulated facts relate. II. Intangible Drilling and Development Costs
The next issue for decision is whether Willow and Carnegie are entitled to deduct payments made for turnkey drilling contracts as IDCs. We have described a "turnkey contract" as: a contract in which an independent drilling contractor undertakes to furnish all materials and labor and to do all the work required to complete a well in a workmanlike manner, place it on production, and turn it over ready to "turn the key" and start oil [or gas] running into the tanks [or pipelines] for an amount stipulated in the contract. * * * Burns v. Commissioner, 78 T.C. 185, 188 n. 7 (1982). Section 263(c)[6] allows taxpayers to elect to currently deduct, rather than capitalize, IDCs in the case of oil and gas wells and geothermal wells. Stradlings Building Materials, Inc. v. Commissioner, 76 T.C. 84, 86 (1981); sec. 1.612-4, Income Tax Regs. *225 (implementing section 263(c)). Each of the petitioners elected to deduct IDCs under section 263(c) in connection with his or her partnership in Willow and/or Carnegie. The deductions were disallowed by respondent. *226 Deductions are a matter of legislative grace and entitlement thereto must by shown by the taxpayer. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). Section 263(c) should be construed narrowly. Levy v. Commissioner, 732 F.2d 1435, 1436 (9th Cir. 1984); see Commissioner v. Jacobson, 336 U.S. 28, 49 (1949); Holt v. Commissioner, 364 F.2d 38, 40 (8th Cir. 1966), cert. denied 386 U.S. 931 (1967). Petitioners have the burden of proof. Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142(a). A. Operator Status
1. Requirement of Ownership of an Operating Interest
Only an "operator" may deduct IDCs. Stradlings Building Materials, Inc. v. Commissioner, supra at 86; sec. 1.612-4(a), Income Tax Regs. An operator is "one who holds a working or operating interest in any tract or parcel of land either as a full owner or under a lease or any other form of contract granting working or operating interests." Stradlings Building Materials, Inc. v. Commissioner , supra at 86; *227 sec. 1.612-4(a), Income Tax Regs.[7]
A working or operating interest is generally the right to the mineral interest generated by an oil or gas lease where the lessee acquires the right to work on the leased property to search, develop, and produce oil and gas and where the lessee has the obligation to pay costs. 1 Polevoi, Federal Taxation of Oil and Gas Transactions, section 9.04, pp. 9-49-9-52 (1988). The regulations applicable to section 263(c) provide: In accordance with the provisions of section 263(c), intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense. * * * Included in this option are all costs of drilling and development undertaken (directly or through a contract) *228 by an operator of an oil and gas property whether incurred by him prior or subsequent to the formal grant or assignment to him of operating rights (a leasehold interest, or other form of operating rights, or working interest); * * * Sec. 1.612-4(a), Income Tax Regs.
The first quoted excerpt from the regulation gives operators the option to expense IDCs if they hold the requisite working or operating interest. The second quoted excerpt makes the expensing option available even if the formal grant of operating rights is made after IDCs are paid or incurred. In Haass v. Commissioner, 55 T.C. 43 (1970), IDCs were allowed for partners who executed written documents after IDCs were paid, but who had earlier informally committed to buy an interest before the IDCs were paid. Following Haass, we will look for petitioners to show that there was at least an informal grant of an operating interest before IDCs were paid or incurred. As is discussed next, we find that petitioners have not shown the existence of an informal grant of operating rights when IDCs were paid or incurred. 2. Willow - Stipulation of Facts
Petitioners *229 did not address the issue of whether the partnerships were operators in their opening brief. In their reply brief petitioners argued that the stipulated facts establish that Willow and Carnegie owned property rights as sublessees of drilling sites and that this ownership qualifies them as operators. If Willow and Carnegie were sublessees of drilling sites, they would be operators. The only evidence noted by petitioners to support their contention that Willow and Carnegie were sublessees is a statement in the preamble of the Willow and Carnegie turnkey contracts. A copy of the Willow turnkey drilling contract is contained in the record, and the parties stipulated that the copy is true and correct. The preamble to the Willow turnkey contract states that Willow is sublessee of certain drilling sites. For reasons discussed below, we find that the stipulation to the correctness of the copy of the Willow turnkey contract is not a stipulation by the parties to the truth of the contents of the contract. Paragraph 4 of the stipulation of facts states: 4. Attached hereto and marked Exhibit 4 is a true and correct copy of the turnkey drilling contract between Willow Drilling, Ltd. *230 and Quadrant Exploration, Inc., dated December 29, 1980. Exhibit 4, the Willow turnkey drilling contract, includes the statement: "Whereas, Owner [Willow] is sublessee of 3 drilling sites in Greer County, Oklahoma * * *." Petitioners offer no corroboration for the conclusion set forth in the statement. Petitioner argues that paragraph 4 is a stipulation by the parties to the facts asserted in Exhibit 4. We disagree based on our reading of paragraph 4 of the stipulation of facts and the other stipulations in these cases. Paragraph 4 of the facts merely establishes that Exhibit 4 is a true and correct copy of the turnkey drilling contract. Reference to paragraphs 1-3 of the stipulation of facts illustrates why we disagree with petitioner. Paragraph 1 similarly states that "attached is a true and correct copy of petitioners' tax returns." Stipulations do not mean the parties have stipulated to the correctness of the contents of the returns. Paragraphs 2 and 3 are similar. We cannot imagine that these paragraphs represent respondent's agreement to the correctness of the contents of the returns. Likewise, we do not believe respondent conceded the correctness of *231 the assertions in the turnkey drilling contract by agreeing the copy was true and correct. Further, there is a stipulated fact in the record inconsistent with the assertion in the turnkey contract. Paragraph 6 of the stipulation of facts provides that: 6. Attached hereto and marked Exhibit 6 is a true and correct copy of an assignment of oil and gas lease which represents the interest which Willow owned and was obligated by Exhibit 4 to drill upon. Exhibit 6 is an apparently unrecorded assignment of an oil and gas lease to Willow, dated August 31, 1981. It represents the interest in the Kopecek lease in Greer County, Oklahoma, which Willow was obligated by the turnkey drilling contract to drill. The only well drilled under the Willow drilling contract was Kopecek 1-5. Except for the Kopecek lease, Willow had no other interest which could support a claim for operator status. In a letter dated May 10, 1982, Moeri wrote to Kass regarding Willow, stating, "On March 8th, 1981, our Partnership's first well (KOPECEK 1-5) had actually been drilled, but to this date has not been properly completed." Petitioners cite no evidence to show that this Penn Pacific assignment is a different *232 interest than that claimed for Willow in 1980. Other than the turnkey contract, petitioners cite nothing to show that they had any interest in Kopecek before August 31, 1981. Moreover, the Penn Pacific assignment document of August 1981, is, we believe, entitled to more weight than the assertion in the preamble. Thus, Willow was not an operator before August 31, 1981. Respondent made no specific objection to the truth of the contents of the stipulated Willow turnkey drilling contract. In contrast, in several other stipulation paragraphs, respondent explicitly stipulated only to the authenticity of and not to the facts contained in an attached exhibit. However, we do not view this as a concession by respondent that the facts asserted in the turnkey contract are true. For the foregoing reasons, we find that petitioners have not carried their burden of proving that Willow owned a working or operating interest before IDCs were paid or incurred, or even in the same taxable year. 3. Carnegie - Deemed Admission
The Carnegie turnkey contract is not a part of the stipulation of facts. Instead, it is an exhibit to respondent's request for admissions which were deemed admitted *233 under Rule 90 after petitioners failed to respond to respondent's request for admissions. For reasons discussed below we find that a statement in the preamble to the Carnegie turnkey contract which provides that Carnegie is sublessee of certain drilling sites does not prove that Carnegie was in fact a sublessee of the drilling sites where the turnkey contract is in evidence as an exhibit to a request for admission. Request for admission number 4 provides, "Attached hereto and marked Exhibit D is a true and correct copy of the turnkey drilling contract between Carnegie Drilling, Ltd. and Command Petroleum Corp., dated December 30, 1981." That turnkey contract executed on December 30, 1981, by Carnegie and Command, includes the statement: "Whereas, Owner is sublessee of drilling sites in Caddo County, Oklahoma, * * *." Rule 90(f) provides in pertinent part: (f) Effect of Admission. Any matter admitted under this Rule is conclusively established unless the Court on motion permits withdrawal or modification of the admission. * * * Thus, while the authenticity of the Carnegie *234 turnkey contract is conclusively established, the admission does not necessarily establish as a fact the recitals within the Carnegie turnkey contract. Our reasons are similar to those given above regarding the contents of the Willow turnkey contract. Further, the record includes evidence which is inconsistent with the Carnegie turnkey contract recital. The stipulation of facts indicates that the first attempt to assign an operating interest by Command to Carnegie occurred in January 1982. Moreover, a recorded lease was not delivered to Carnegie until April 1983. Unlike Willow, the record contains no stipulated assignment document for Carnegie. Accordingly, petitioners have not borne their burden of proving that Carnegie was an operator in 1981 or 1982. 4. Operator Status - Conclusion
Because Willow did not have operator status in 1980, the year IDCs were incurred, it is not eligible to elect to expense IDCs. Willow is not entitled to deduct IDCs for 1981 because payments were made in 1980. Sec. 1.461-1(a), Income Tax Regs.
Similarly, because Carnegie did not have operator status in 1981, the year IDCs were incurred, or in 1982, it is *235 not eligible to elect to expense IDCs . III. At Risk
The next issue for decision is whether the petitioners have any amount at risk in the Willow and Carnegie partnerships beyond their cash contributions. The at risk rules apply to oil and gas property as defined under section 614. Sec. 465(c)(2)(D). An investor's loss is limited to amounts at risk at the close of the taxable year in which the loss would otherwise be deductible reduced by losses allowed in prior years. Sec. 465(b)(5). A. Willow. Petitioners argue that the at risk rules of section 465 do not limit losses here because the notes they executed for Willow are recourse notes on their face. The Willow partnership agreement limited partners' liability to their capital contribution, including these notes. On December 29, 1980, the $ 110,000 of notes of the Willow partners were assigned to K and S. Thus, K and S became a creditor of the Willow partners. One of the partners was Mortimer Kass. He was also one of the owners of K and S. Thus, Kass had an interest as a creditor (through his interest in K and S), *236 and as a limited partner, and thus as an investor in Willow. Kass' law firm of Kass & Fried, P.A., represented both Willow and Willow's general partner, Moeri. They prepared documents and rendered tax advice in connection with the Willow offering. They also represented Hogan's company, Quadrant. Section 465(b)(3) provides that an investor is not at risk on a recourse note held by a creditor with an interest in the activity other than as a creditor. An extensive analysis for the reason for this rule is provided in Bennion v. Commissioner, 88 T.C. 684, 697-698 (1987). In that case we said: Creditors who hold recourse obligations, but who also have certain other interests in the activity, might disregard their rights thereunder in favor of protecting or enhancing their other interests in the activity. In light of that eventuality and in spite of the otherwise recourse nature of the debt, taxpayers who owe recourse debt obligations to such creditors are not to be regarded as at risk with respect thereto. Bennion v. Commissioner, supra at 698. *237 Thus, a creditor with an interest other than as a creditor would not act independently with respect to the debt. Petitioners' only argument to counter the prohibited creditor rule is that K and S received the Willow promissory notes as a result of a sale and not a loan; therefore, the prohibited creditor rule does not apply. We disagree. Petitioners offer no authority for their position. We note that petitioners refer to the assignment document as proof of a sale. It provides on its face: For Value Received, the undersigned Willow Drilling, Ltd. hereby sells, assigns, and transfers unto K&S Associates, Inc. without recourse, all right, title, and interest in and to the Promissory Notes of the Limited Partners of Willow Drilling, Ltd. in aggregate principal amount of $ 110,000, which are listed on Schedule "A" annexed hereto. We are not convinced that a sale occurred. Moreover, in light of the above-stated reason for the rule, even if some type of sale had taken place, K and S remains a creditor with a prohibited interest. We believe there was never any intent to enforce *238 the recourse nature of the Willow notes. No demand was ever made for payment. There was no suit to enforce payment on the notes. We take this to show that the notes which were nominally recourse were never intended to be recourse. Porreca v. Commissioner, 86 T.C. 821, 840 (1986). We suspect if any repayment was contemplated, it was not for more than any payments received from production on wells drilled for Willow. We note that the promissory notes provide that three-fourths of the production payments could go to payment of the notes. The presence of drilling risk insurance also affects the at risk question. The turnkey contract names the partnership as a co-owner of the drilling risk insurance. This gives the partnership and partners the right to receive proceeds of any claim paid on nonproductive wells. This feature was admittedly significant to the investors. A taxpayer is not at risk to the extent he is protected against economic loss by the purchase of insurance. Bennion v. Commissioner, supra at 692. Because the insurance company bore *239 the risk of an initially unproductive well, not the partnership or partners, the limited partners were effectively protected against loss to the extent of the drilling risk insurance coverage. We note also that the Willow turnkey drilling contract further limits risk with a commercially productive well requirement which provides: The term "commercially productive" shall refer to an oil or gas well which, when tested prior to casing, is determined to be capable of producing sufficient quantities of oil or gas to return to Owner the turnkey price per well (as specified in Paragraph 2, hereof) within a thirty-six (36) month period commencing on the date oil or gas production begins. We hold that petitioners are not at risk beyond their cash contributions to Willow. B. Carnegie. The Carnegie partners executed notes that purport to be recourse. The partnership agreement limited the partners' liability to their capital contribution, including these notes. The notes were assigned to the driller, Command, in December 1981. There is no indication they were negotiated as opposed to assigned. The notes were not transferred to an independent lender. The notes were never converted *240 into proceeds which could be used for Carnegie. Even the tax opinion in the Carnegie prospectus warns that, without transfer to an independent lender, use of funds in the partnership, and personal liability for the notes, the limited partners would not generally be at risk. No amounts were ever borrowed. Nor was there any effort to collect on the Carnegie notes. We conclude that the notes were shams. Capek v. Commissioner, 86 T.C. 14 (1986). We hold that the Carnegie investors are not at risk beyond their cash contribution. IV. Deductions for Carnegie's Legal, Financing, and Management Fees
Except for docket Nos. 41476-86 (petitioners Owen) and 13374-87 (petitioners Holland) petitioners took deductions in taxable year 1981 for their distributive shares of legal, financial, and management fees. Respondent disallowed those deductions on the theory that petitioners have not shown that such fees were incurred as ordinary and necessary expenses while engaged in an active trade or business. Petitioners note that respondent could make the same argument with respect to Willow in 1980, but did not do so. We agree that it appears that Willow would be subject *241 to the identical concerns, but since respondent, for whatever reason, did not disallow deductions for legal, financial, and management fees paid by Willow in 1980, we do not address the issue here. On brief, respondent argues, "Alternatively, if any of these expenses were properly incurred, their treatment is mandated by Section 709, resulting in amortization of organizational expenses and capitalization of other expenses." Petitioners concede that Carnegie's deductions for legal, financial, and management fees should not be deducted and adopt respondent's alternative position. We agree and so find. V. Additions to Tax Under Sections 6653(a)(1) and (a)(2)
Respondent determined additions to tax for negligence under sections 6653(a)(1) and (a)(2) in docket Nos. 18050-87, 18052-87, 32313-87, 39079-87, and 37014-87 with respect to Carnegie. Section 6653(a)(1) imposes an addition to tax of 5 percent of an underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of the rules and regulations. In addition, section 6653(a)(2) imposes a further addition to tax of 50 percent of the interest payable on the portion of the underpayment attributable *242 to negligence. Except for docket Nos. 41476-86 (petitioners Owen; taxable year 1982) and 13374-87 (petitioners Holland; taxable year 1980), respondent determined that petitioners are liable for additions to tax for negligence or intentional disregard of rules and regulations pursuant to sections 6653(a)(1) and (a)(2). Petitioners bear the burden of proving that their underpayment of tax was not due to negligence. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972); Soares v. Commissioner, 50 T.C. 909, 914 (1968); Rule 142(a). Under section 6653(a), negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Marcello v. Commissioner , 380 F.2d 499, 506 (5th Cir. 1967); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners contend that they are not subject to the additions *243 to tax under section 6653(a) because Federal income tax returns were prepared by the nationally known accounting firm, Peat, Marwick, Mitchell & Company, Certified Public Accountants, for all petitioners. As a general rule, the duty of filing accurate returns cannot be avoided by placing responsibility on a tax return preparer. Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974); Enoch v. Commissioner, 57 T.C. 781, 802 (1972). However, good faith reliance on the advice of counsel or a qualified accountant can be, under certain circumstances, a defense to the addition to tax for negligence. Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968). We have held taxpayers liable for additions to tax for negligence when they argued reliance on an attorney, accountant, tax advisor, or tax return preparer where there was no showing of the information that the taxpayer gave to the advisor. Enoch v. Commissioner, supra at 803; Pessin v. Commissioner, 59 T.C. 473, 489 (1972); Lester Lumber Co. v. Commissioner , 14 T.C. 255, 263 (1950). Petitioners did not provide any evidence *244 as to the information that they gave to their accountants and lawyers. [8] Accordingly, we do not know what information and documents petitioners' accountants had to prepare the subject returns. Petitioners also argue that the additions to tax for negligence are avoided because they relied on the prospectuses provided by the promoters as would be expected of a reasonable, prudent person. We disagree. Each prospectus included several caveats with respect to the Federal income tax consequences of the transactions and included the warning, "Accordingly, each prospective Limited Partner is urged to consult his own tax advisor with respect to the Federal * * * income tax consequences to him of his investment in the Partnership." Petitioners have failed to prove that respondent's determinations with respect to additions to tax under section 6653(a) are in error. They have not convinced us that any part of the underpayment was not due to negligence. Accordingly, we find that all of the underpayments are due to negligence except for docket Nos. 41476-86 and 13374-87. V. Additions to Interest Under Section *245 6621(c)
Except for docket Nos. 41476-86 and 13374-87, respondent determined that petitioners are liable for additional interest on an underpayment attributable to a tax-motivated transaction as defined in section 6621(c). Additional interest at the increased rate of 120 percent of the statutory rate imposed on underpayments is imposed on tax-motivated transactions under section 6621(c) with respect to interest accruing after December 31, 1984, regardless of when the return was filed. Section 6621(c) provides in pertinent part: (c) INTEREST ON SUBSTANTIAL UNDERPAYMENT ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS. -- (1) In General. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment rate established under this subsection. (2) Substantial Underpayment Attributable to Tax Motivated Transactions. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated *246 transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $ 1,000. (3) Tax Motivated Transactions. -- (A) In General. -- For purposes of this subsection, the term "tax motivated transaction" means -- * * * (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), * * * (v) any sham or fraudulent transaction. The additional interest applies after December 31, 1984, even if the transaction was entered into before that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). As discussed above, losses were disallowed by reason of section 465(a). Thus, section 6621(c) is applicable. In accordance with the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: John A. Holland and Clo R. Holland, docket No. 13374-87; Charney Hermann, docket No. 18050-87; Robert Crocker and Bobby Crocker, docket No. 18052-87; John P. Thomas, III and Polly A. Thomas, docket No. 32313-87; Donald S. Henderson and Marjorie L. Henderson, docket No. 37014-87; Frank Owen and Marianne Owen, docket No. 39079-87.↩
2. All section references are to the Internal Revenue Code, as amended and in effect for the years at issue, unless otherwise noted. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
3. In docket No. 18052-87, petitioners' income tax return for the year at issue showed $ 1,900.92 owed in tax. This amount was incorrect due to a math error. Petitioner was assessed tax in the sum of $ 1,890. Petitioner was paid a refund of $ 3,182.78 instead of $ 3,171.86 which was the refund shown to be paid on the return. * These amounts reflect additions to tax under section 6653(a)(1)↩.
4. The only issue in docket No. 41476-86 was whether petitioners Frank and Marianne Owen were entitled to a charitable contributions carryover for taxable year 1982. Respondent disallowed the carryover in the statutory notice of deficiency. No additions to tax were determined. The petition in that case alleged as error the disallowance of the charitable contributions carryover. Petitioners did not address this issue in either of the briefs that they submitted in these cases. Accordingly, we find that petitioners have abandoned this issue.↩
5. Oilfunds Investments, Inc., as is used in the Exhibits, and Oil Funds Investments, Inc., as is used in the stipulations of fact, both being owned by Hogan, are treated as the same entity.↩
6. Section 263(c) provides: (c) INTANGIBLE DRILLING AND DEVELOPMENT COSTS IN THE CASE OF OIL AND GAS WELLS AND GEOTHERMAL WELLS. -- Notwithstanding subsection (a), regulations shall be prescribed by the Secretary under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress. Such regulations shall also grant the option to deduct as expenses intangible drilling and development costs in the case of wells drilled for any geothermal deposit (as defined in section 613(e)(3)↩) to the same extent and in the same manner as such expenses are deductible in the case of oil and gas wells.
7. See also Hutchinson v. Commissioner, T.C. Memo. 1980-551↩.
8. See Samp v. Commissioner, T.C. Memo. 1981-706↩.